237 P.3d 24 (2010)
In the Matter of Chauncey M. DEPEW, Respondent.
No. 103,061.
Supreme Court of Kansas.
August 6, 2010.
Stanton A. Hazlett, Disciplinary Administrator, argued the cause and was on the brief for the petitioner.
John E. Harvell, of John E. Harvell, P.A., of Olathe, argued the cause and was on the brief for respondent, and Chauncey M. Depew, respondent, argued the cause pro se.

ORIGINAL PROCEEDING IN DISCIPLINE
PER CURIAM:
This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Chauncey M. Depew, of Kansas City, Missouri, an attorney admitted to the practice of law in Kansas in 1993.
On January 7, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer and probation plan on March 2, 2009. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on March 12, 2009, where the respondent was personally present and was represented by counsel. The hearing panel *25 determined that respondent violated KRPC 8.4(d) (2009 Kan. Ct. R. Annot. 602) (engaging in conduct prejudicial to the administration of justice) and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"FINDINGS OF FACT

....
"2. The Respondent practices law in Johnson County, Kansas. In 2007 and 2008, the Respondent's practice consisted of criminal defense, traffic defense, and traffic prosecution. From time to time, the Respondent would serve as a municipal court judge. Approximately two or three times per month, the Respondent served as a pro tem judge in the Johnson County District Court.
"3. On April 29, 2008, the Respondent self-reported misconduct. The Respondent's letter to the Disciplinary Administrator included the following:
`I am writing to self-report a violation of the Kansas Rules of Professional Conduct that I committed. On Friday, January 18, 2008 I was Judge Pro Tem in Johnson County District Court ... When I arrived that morning, I engaged in a casual conversation with the Judge's Administrative Assistant, ... where we both made sexual innuendoes. During the conversation, I made inappropriate comments about what she was wearing. At one point, as she was walking past me in her office, I reached out and put my hand on her arm and asked her, "Where are you going?" I have, in the past, though not as a Pro Tem judge, made inappropriate comments to other Johnson County court staff of a sexual nature.'
"4. On May 1, 2008, the Honorable Steve Tatum filed a complaint against the Respondent for having engaged in inappropriate conduct with five female Administrative Assistants of District Court Judges in Johnson County, Kansas. The Respondent was personally acquainted with each of the five Administrative Assistants.
"Administrative Assistant #1

"5. In late 2007 or early 2008, Administrative Assistant #1 (AA#1) asked the Respondent to handle a number of parking tickets for her. The Respondent negotiated with the prosecutor and was able to have the fines for the parking tickets reduced by half, provided the fines were paid that day. The Respondent paid the fines for AA#1. The Respondent did not charge AA#1 any attorney fees.
"6. From time to time, AA#1 made payments to the Respondent for the fines he paid in her behalf. One day, AA#1 told the Respondent that she had a $50.00 check for him to apply toward the balance owed. She asked the Respondent to stop by her office to pick it up. When he stopped by AA#1's office, AA#1 commented that her next payment should be the last payment for the tickets. The Respondent stated, `We can take care of this in other ways.' AA#1 responded by giving the Respondent the check and telling him to get out of her office. Later, on another day, the Respondent stopped by AA#1's office to pick up the last $50.00 payment on her tickets. The Respondent repeated the comment, `You can take care of this in other ways.' AA#1 reported this conduct to the judge for whom she works.
"Administrative Assistant #2

"7. The Respondent has known Administrative Assistant #2 (AA#2) for 11 years. During the Winter of 2007, a jury trial was being conducted in the division where AA#2 works. During the trial, the Respondent came in and sat down in a chair by the door. At first, AA#2 was facing away from the Respondent. When AA#2 turned around, she observed the Respondent leaning back in his chair rubbing his genital area.
"8. Early one morning in 2008, AA#2 was working in her office. The Respondent came in and asked her to expose her breasts to him. AA#2 told the Respondent that that was not going to happen. AA#2 attempted to leave her work area to *26 fill a water bottle at the water dispenser, when the Respondent blocked her from leaving that area by standing in the doorway.
"9. As the Respondent was standing in the doorway, he reached and grabbed AA#2's left arm and said, `Come on, just give me two minutes.' AA#2 had to forcibly remove her arm from the Respondent's grasp.
"10. Approximately two weeks later, the Respondent was sitting in a chair in AA#2's office. AA#2 left her office to go to the courtroom and the Respondent remained in her office. When she returned there was a small note on her desk from the Respondent. The note read, `I want to lick your butt.' Later that day, AA#2 advised the judge for whom she works of all the incidents which had occurred.
"Administrative Assistant #3

"11. On March 7, 2007, the Respondent acted as a pro tem judge in the division where Administrative Assistant #3 (AA#3) works. The Respondent was in AA#3's office when she told the Respondent that she would like to have some coffee. The Respondent replied by saying, `I have something you would like.' AA#3 turned around and observed the Respondent who was exposing his genitals to her. AA#3 told the Respondent that she could not believe that he did that, especially in light of the fact that he was engaged to be married. The next day, AA#3 reported the Respondent's conduct to the judge for whom she works.
"Administrative Assistant #4

"12. Just prior to Christmas, 2007, the Respondent was in Administrative Assistant #4's (AA#4) office as she was preparing to leave work for the day. AA#4 indicated to the Respondent that she was having a bad day. The Respondent left AA#4's office and went to the men's restroom at the Johnson County Courthouse. While in the restroom, the Respondent, using his mobile telephone, took a digital photograph of his penis. The Respondent sent AA#4 the picture of his penis using his mobile telephone. The Respondent asked her to return a picture of herself and send it back to his mobile telephone.
"13. On a different day, the Respondent, knowing that AA#4 has a tattoo on her lower back, asked to see the tattoo. The Respondent put his finger in the back of AA#4's pants and pulled her pants to be able to see AA#4's tattoo.
Administrative Assistant #5
"14. In the Fall or Winter of 2007, the Respondent left a note on Administrative Assistant #5's (AA#5) computer monitor. The note read, `You're Hot.'
"CONCLUSIONS OF LAW

"1. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 8.4(d) and KRPC 8.4(g), as detailed below.
"2. `It is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in `conduct that is prejudicial to the administration of justice' when he engaged in a pattern of inappropriate sexual conduct with five Administrative Assistants of the Johnson County District Court.
"3. Specifically, the Respondent suggested that AA#1 could take care of her outstanding fines in other ways. The Respondent rubbed his genital area in front of AA#2. On a second occasion, the Respondent asked AA#2 to expose her breasts to him, blocked her exit from her office when she refused to expose her breasts, and grabbed her arm as she was attempting to leave. On a third occasion, the Respondent left an inappropriate note for AA#2. The Respondent, while present to serve as pro tem judge, exposed his genitals to AA#3. Further, the Respondent took a digital photograph of his penis, while in the Johnson County Courthouse and sent it, via a mobile telephone text message, to AA#4. The Respondent left an inappropriate note on the desk of AA#5.

*27 "4. The Respondent's conduct prejudiced the administration of justice and, therefore, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).
"5. `It is professional misconduct for a lawyer to ... engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The Respondent repeatedly engaged in inappropriate conduct, including sexual conduct, with several Administrative Assistants of the Johnson County District Court. The Respondent rubbed his genital area in front of AA#2. Additionally, the Respondent asked AA#2 to expose her breasts, blocked her exit from her office, and grabbed her arm when she tried to leave. The Respondent exposed his genitals to AA#3. The Respondent took a digital photograph of his penis and sent it via a mobile telephone text message, to AA#4. The Respondent's extreme behavior adversely reflects on his fitness to practice law. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).
"AMERICAN BAR ASSOCIATION STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter `Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.
"Duty Violated. The Respondent violated his duty to the public to maintain his personal integrity.
"Mental State. The Respondent knowingly and intentionally violated his duty.
"Injury. As a result of the Respondent's misconduct, the Respondent caused actual injury to the Administrative Assistants and to the administration of justice in Johnson County District Court.
"Aggravating or Mitigating Factors. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factor present:
"Prior Disciplinary Offenses. Following a hearing before a Hearing Panel of the Kansas Board for Discipline of Attorneys, the Respondent was informally admonished for violating KRPC 8.4(a).
"A Pattern of Misconduct. The Respondent engaged in a pattern of sexual misconduct.
"Vulnerability of Victim. The Administrative Assistants were vulnerable to the Respondent's misconduct. Some of the Administrative Assistants were friends with the Respondent and he exploited his friendship by engaging in sexually harassing conduct.
"Substantial Experience in the Practice of Law. The Respondent was admitted to the practice of law in the state of Kansas in 1993. At the time of the Respondent's misconduct, the Respondent had been practicing law for a period of 14 years. As such, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time the misconduct occurred.
"Illegal Conduct. The Respondent engaged in illegal conduct when he exposed himself to AA#3 and stated, `I think I have something you would like.' Additionally, the Respondent may have also engaged in illegal conduct when he sent a digital photograph of his penis to AA#4 via a mobile telephone text message.
"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:
"Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct. The Respondent suffers from a medical condition called hypogonadism *28 a low level of testosterone. The Respondent's physician prescribed AndroGel, a testosterone topical gel. The Respondent suffered side effects from the use of this medication. Specifically, the Respondent became aggressive, excitable, nervous, and agitated. Additionally, as a result, the Respondent developed depression.
"The Respondent's testimony is unclear as to whether (1) the Respondent previously suffered from depression, (2) the low level of testosterone in his system led to the depression, (3) use of AndroGel led to the depression, or (4) a discontinuation of AndroGel would lead to an exacerbation of the depression. The Respondent continues to apply AndroGel.
"The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions. While the Respondent generally acknowledged his conduct at the hearing, he minimized his conduct in his self-report letter and in his testimony at the hearing. The Respondent attempted to minimize the significance of his misconduct relating to AA#2, AA#3, and AA#4, by asserting that the conduct was not as egregious because he has been friends with AA#2, AA#3, and AA#4 for some period of time.
"Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent enjoys the respect of his peers in the Johnson County bar as evidenced by several letters received by the Hearing Panel.
"Remorse. The Respondent expressed genuine remorse at the hearing on this matter.
"Remoteness of Prior Offenses. The misconduct that led to the Respondent's previous discipline occurred in 1995 and was remote in time to the present case. Additionally, the type of misconduct that led to the Respondent's previous discipline was remote in character to the misconduct in the present case.
"Any Statement by the Complainant Expressing Satisfaction with Restitution and Requesting No Discipline. The Administrative Assistants did not file the complaint and, accordingly, the Administrative Assistants are not Complainants. However, it is relevant that it was proffered that the Administrative Assistants generally requested that the Respondent not be disciplined.
"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:
`7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'
"RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be suspended from the practice of law for a period of six months. The Disciplinary Administrator further recommended that the Respondent be required to undergo a hearing pursuant to Kan. Sup.Ct. R. 219, prior to reinstatement.
"The Respondent requested that he be placed on probation subject to the terms and conditions of his proposed probation plan, pursuant to Kan. Sup.Ct. R. 211(g). That rule provides:
`(1) If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least ten days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

*29 `(2) If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.
`(3) The Hearing Panel shall not recommend that the Respondent be placed on probation unless:
(i) the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least ten days prior to the hearing on the Formal Complaint;
(ii) the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;
(iii) the misconduct can be corrected by probation; and
(iv) placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.
"The Hearing Panel recognizes that each provision of Kan. Sup.Ct. R. 211(g) must be satisfied in order for a Hearing Panel to recommend that a Respondent be placed on probation. In this case, the Respondent has not satisfied each provision of Kan. Sup.Ct. R. 211(g). Specifically, the Respondent's plan of probation is not substantial and detailed. Further, the plan of probation was not provided to each member of the Hearing Panel and the Disciplinary Administrator at least 10 days before the hearing. Finally, from the testimony before the Hearing Panel, it is unclear whether the probation plan had been put into effect prior to the hearing.
"However, in the opinion of a majority of the Hearing Panel, substantial justice requires that the Respondent receive probation in this case.
"Based upon the findings of fact, conclusions of law, and the Standards listed above, a majority of the Hearing Panel recommends that the Respondent be suspended from the practice of law for a period of two years. A majority of the Hearing Panel further recommends that the Respondent be granted probation from the suspension, subject to the following terms and conditions:
"1. Psychological Treatment. The Respondent shall continue his treatment for depression with Dr. Jeffrey Miller, throughout the period of supervised probation unless, in Dr. Miller's opinion, continued treatment is no longer necessary. The Respondent shall follow all treatment recommendations of Dr. Miller, Dr. Bruce M. Cappo, or other treatment provider. Dr. Miller shall notify the Disciplinary Administrator in the event that the Respondent discontinues treatment against the recommendation of Dr. Miller during the probationary period. The Respondent shall provide Dr. Miller with an appropriate release of information to allow Dr. Miller to provide such information to the Disciplinary Administrator and the practice supervisor. Dr. Miller shall provide the Disciplinary Administrator and the practice supervisor with quarterly reports regarding the Respondent's treatment status and level of treatment compliance throughout the period of probation.
"2. Limitation of Practice. The Respondent shall not work as a pro tem judge or other judge in any court throughout the period of probation.
"3. Letters of Apology. The Respondent shall write letters of apology to AA#1, AA#2, AA#3, AA#4, and AA#5. In addition, the Respondent shall also write letters of apology to each of the five respective division judges. The Respondent shall provide a copy of the letters of apology to the Disciplinary Administrator's office, by July 1, 2009.
"4. Contact with Administrative Assistants. The Respondent shall have no contact, in person or by telephone, with AA#1, AA#2, AA#3, AA#4, and AA#5, except as needed professionally.

*30 "5. Practice Supervision. The Respondent's practice will be supervised by attorney Lance E. Hanson. The Respondent shall allow Mr. Hanson access to his client files, calendar, and trust account records. The Respondent shall comply with any requests made by Mr. Hanson. During the first year of the period of probation, the Respondent shall meet with Mr. Hanson weekly. During the final year of the period of probation, the Respondent shall meet with Mr. Hanson as directed by Mr. Hanson. Mr. Hanson shall prepare a monthly report to the Disciplinary Administrator regarding the Respondent's status on probation.
"6. Audits. During the period of probation, Mr. Hanson shall conduct three thorough audits of the Respondent's files. Within thirty (30) days of the date of this report, Mr. Hanson shall conduct an initial audit of the Respondent's files. After the Respondent has been on probation for one year, Mr. Hanson shall conduct a second audit. Prior to the completion of the second year of probation, Mr. Hanson shall conduct a third audit. If Mr. Hanson discovers any violations of the Kansas Rules of Professional Conduct, Mr. Hanson shall include such information in his monthly reports. Mr. Hanson shall provide the Disciplinary Administrator and the Respondent with a copy of each audit report. The Respondent shall follow all recommendations and correct all deficiencies noted in Mr. Hanson's periodic audit reports.
"7. Continued Cooperation. The Respondent shall continue to cooperate with the Disciplinary Administrator. If the Disciplinary Administrator requests any additional information, the Respondent shall timely provide such information.
"8. Additional Violations. The Respondent shall not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the Respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the Respondent shall immediately report such violation to the Disciplinary Administrator. The Disciplinary Administrator shall take immediate action directing the Respondent to show cause why the probation should not be revoked.
"Costs are assessed against the Respondent in an amount to be certified by the office of the Disciplinary Administrator.
"CONCURRING AND DISSENTING OPINION

"While I join in the Findings of Fact and the Conclusions of Law, I must respectfully dissent from the Recommendation made by the majority in this case. After careful consideration of the evidence, there are a number of factors that, in my view, require the suspension of the Respondent's license to practice law.
"First, the nature of the Respondent's misconductmultiple acts of sexual harassment of female employees at the Johnson County District Court over an extended period of timewarrants significant discipline. The evidence in this case shows a clear pattern of inappropriate and, in some cases, egregious conduct that characterized Respondent's interactions with five female Administrative Assistants (hereinafter AAs) from 2007 until early 2008, when the Respondent was advised that his behavior had been reported to the disciplinary authorities. This conduct ranged from improper, sexually-suggestive comments to one incident in which the Respondent exposed himself to an AA in her office in the Johnson County Courthouse.
"On one occasion, the Respondent left a note on an AA's desk that said: `I want to lick your butt.' On another occasion, the Respondent posted a note on another AA's computer screen while she was out of the courtroom during a brief recess. The note said, `You're hot.' The Respondent testified that he posted the note because the AA `appeared to be in a pretty bad mood.' He did it, he said, because he `thought it would make her smile, lighten her mood a little bit.' The Respondent later admitted that he `really didn't know [this AA] very well at all.'

*31 "In addition, on two separate occasions, the Respondent suggested to a third AA, with whom he had an attorney-client relationship, that she could `take care of the fines' he had paid on her behalf `in other ways.' After the second such comment, the AA was troubled enough with the Respondent's conduct that she reported it to the judge for whom she worked.
"Although the Respondent described the AA as `the one [of the five AAs] I'm least friendly with,' he admitted in later testimony that she knew and trusted him enough to hire him to handle a legal matter and that he had learned intimate details about her through mutual friends. The Respondent denied any connection between his knowledge of these intimate details and his suggestion that she could pay her fines `in other ways,' however, his testimony in that regard is troubling because the one consistency in Respondent's relationships with all five AAs was his knowledge of intimate details of their lives, whether he obtained those details from the AAs themselves or from others.
"The Respondent said he was only `joking' when he told the AA that she could take care of her fines `in other ways' and that she understood that he expected her to pay the fines he had advanced on her behalf. Apparently, she did not understand that the Respondent's comments were merely in jest because she reported his statements to the judge for whom she worked. The Respondent now admits that he `absolutely [does] understand how [this AA] could take it a different way....'
"Unfortunately, the Respondent did not confine his conduct to inappropriate suggestions and comments. A fourth AA turned around at her desk one day to find Respondent seated on a chair a few feet away rubbing his genital area. On more than one occasion, the Respondent asked this AA to show him her breasts. She refused. On one of those occasions, the Respondent blocked the AA from leaving her work area by standing in the doorway, grabbing her arm and asking her to `give [him] two minutes.' In order to free herself from the Respondent's grasp, the AA had to physically pull away.
"The Respondent testified that he knew this AA for 11 years and considered her a 'friend.' Like most of the other AAs, the Respondent testified that this AA had confided in him about personal problems and he, in turn, had confided in her. When asked why he thought that it was acceptable for him to sit in her office and rub his genital area, the Respondent testified, `I just felt that because we were friends, that if I said something or did something ... she wouldn't be offended by it, I guess....' In follow up to that question, the Respondent acknowledged that, although he did not think the AA would be offended by his conduct, `I ... didn't really analyze it before I did any of this stuff.'
"Even with this AA, whom he grabbed by the arm and asked for `two minutes' and who clearly told him: `That isn't going to happen,' the Respondent minimized his conduct. Rather than simply acknowledging that his actions were wrongful, the Respondent tried to explain that `the whole incident took maybe 30 seconds, maybe a minute, and it wasn't ... complete at the time anyway.' It is unclear what the Respondent meant by that, but he went on to say that, although `it's easy to look back on it now and know how wrong what I did was, at the time ... I didn't take it as ... her being offended by what I said ... I felt she knew I was joking and she was joking, too....'
"Another AA was a victim of the Respondent's decision to expose his genitals to her. There was almost no mention of this incident by the Respondent during the hearing, but he did acknowledge that it occurred. The AA told the Respondent that she could not believe what he had done, but the Respondent testified that he did not take that comment seriously. Although the Respondent ultimately acknowledged that the AA was `obviously shocked' by his conduct, he pointed out that the incident involving this AA happened `a long time before the other incidents' and that he and the AA were `still friends.' The Respondent went on to explain that he did not think any of the AAs would be `outraged' by his behavior, not *32 even the AA to whom he exposed himself. In fact, the Respondent testified that he thought that `she would laugh and, you know, say what she said but, you know, in a laughing manner, I guess.'
"At the time the Respondent exposed himself to this AA, the Respondent had known her for five or six years and was acting as a pro tem judge in the division in which she worked. The Respondent testified that he had engaged in `pretty intimate conversations' about a variety of issues with the AA, including conversations about her relationship with her husband and her children. The friendship between the Respondent and the AA was strong enough that the Respondent testified he had helped her school age son with a paper he was working on relating to Viet Nam.
"Yet another AA received, via cell phone transmission, an unsolicited picture of the Respondent's penis. The Respondent acknowledged that the conduct occurred but attempted to explain that the AA had experienced a `bad day' or was `upset for some reason' and that he was trying to cheer her up. The Respondent testified that he told her, `well, if you give me your phone number ... I'll send you a picture.' He went on to testify, `... so I went to the bathroom down the hallway from where that division was and took a picture of my penis with my cell phone, and I sent it to her.' ...
"On another occasion, the same AA, who had a tattoo on her lower back, was sitting in a chair in her office at the courthouse, leaning forward, exposing the top of her tattoo. The Respondent testified that he walked over and stuck his finger in the gap between the waistband of her pants and her back and pulled the pants back further so he could see the entire tattoo.
"In addition to the nature of the misconduct at issue here, I am troubled by the Respondent's failure to take full responsibility for his actions. While he testified on several occasions that he understood that what he had done was wrong, he minimized his conduct by talking about the friendships he shared with each of these women, as though that somehow justified his conduct. The fact that he did not recognize that his behavior crossed ethical boundaries until after he was contacted by the administrative judge for Johnson County is also troubling.
"Third, I am not convinced we heard clear and convincing evidence that the Respondent's depression or his steroid use were significant causes of his behavior. Dr. Bruce Cappo, the forensic psychologist who evaluated the Respondent shortly after the investigation of this matter began, testified that he saw the Respondent in June, 2008, for the sole purpose of conducting an evaluation on the recommendation of his counsel. Cappo provided the Respondent with no treatment or recommendations, other than that the Respondent `see a therapist and, if he wasn't getting better, that medication was one option to utilize as well.' Cappo testified that the Respondent had `very strong ideas' about mental health issues and that, unfortunately, deterred him from seeking treatment for his depression as early as he might have. According to Dr. Cappo, the Respondent views depression as a weakness.
"Although Dr. Cappo indicated that he was supportive of the Respondent's decision to try therapy first and then add medication, if necessary, he also testified that the Respondent's level of depression at the time of his evaluation placed him in the top 2.5% of depressed adults based on the results of the Minnesota Multiphasic Personality Inventory (MMPI).
"Significant in my view was Dr. Cappo's testimony that the Respondent's depression was only `one slice of the pie.' Based on Dr. Cappo's testimony, other contributing factors included concern about the children from his first marriage, his financial situation, and his marriage, all of which were stressors that Dr. Cappo indicated the Respondent was not dealing with appropriately.
"According to Dr. Cappo's report, the Respondent's conduct toward the AAs in the Johnson County Courthouse was the result of his desire for a `quick fix' and his need to feel better about himself. This *33 would not, however, have affected his ability to distinguish right from wrong. What it did instead, according to Dr. Cappo, was to cause the Respondent to want to feel better `at any cost at that moment, and his self-perception that the assistants were participating in this with him ... helped this rationalization.'
"By the time the Respondent saw Dr. Cappo for his evaluation, he had been reported to the Disciplinary Administrator's office and the investigation was ongoing. At that time, the Respondent presented himself to Dr. Cappo in what Cappo has described as a `very straightforward fashion,' acknowledging that his conduct had been inappropriate.
"At some point in his testimony, the Respondent acknowledged that, after some of the incidents, he thought: `I shouldn't have done that' but did not realize his conduct created an ethical issue `because [he and the AAs] were friends' though he knew that he had `gone over the line ...' at times.
"Why, then, I find myself asking, didn't the conduct stop? Clearly the Respondent was capable of controlling his urges because the disciplinary investigation turned up no similar incidents in the other courthouses where the Respondent regularly appeared. If the Respondent understood, as he testified, that he knew some of his behavior crossed the line at the time he was doing it, why didn't he seek help and, further, will he seek help in the future if additional stressors bring him to the same point?
"Perhaps part of the explanation for the Respondent's failure to modify his conduct lies in his further testimony that, when the conduct was occurring, the Respondent never believed that the AAs would report his conduct to their Judges and did not anticipate that there would be adverse consequences. In fact, the Respondent testified, 'I absolutely did not think they would. I never thought about that.' Now, when faced with the consequences of his actions, the wrongful nature of the conduct seems clear to the Respondent. Given the Respondent's testimony that there were times when he realized that he should not have engaged in the inappropriate conduct described herein, one has to question whether he perceived his friendships with these women as a license to conduct himself in a manner that he would have otherwise recognized as wholly inappropriate.
"Though it is not a significant factor in my recommendation, I have some concern that there may have been other incidents of similar conduct that were not reported. An example of one such incident came in through Dr. Cappo, both in his testimony and in his report. According to Dr. Cappo, the Respondent told an AA that he could see her breasts through her blouse. None of the AAs at issue here reported an incident of that nature.
"Dr. Cappo also testified that the Respondent's use of Androgel during the worst of his depression may have complicated things by increasing the level of his depression and energizing his `system sexually.' I have difficulty rectifying Dr. Cappo's opinions in that regard with the Respondent's testimony that he continues to take Androgel but now experiences no side effects and that his very severe depression substantially abated or was cured by approximately ten visits with a counselor, the last of which occurred around the first of the year, with no medicinal intervention. Dr. Cappo's testimony was clear that, because he had not seen the Respondent in approximately a year and then saw him only for purposes of evaluation, he did not have an opinion about what the future would hold for the Respondent.
"Dr. Jeffrey Miller did see the Respondent for counseling after Dr. Cappo's evaluation. The evidence reflects that the last counseling the Respondent obtained was around the beginning of 2009. Dr. Miller did not appear personally at the hearing but did prepare a letter setting forth his opinions, indicating that Respondent sought his assistance `after a lapse in judgment in his professional demeanor.' For reasons that are not clear from the record, Dr. Miller apparently did not conclude, as Dr. Cappo had, that the Respondent suffered from major depression but instead *34 concluded that he had an Adjustment Disorder, Unspecified (DSM-IV 309.9).
"Dr. Miller's letter suggests the Respondent was very concerned about `his reputation and standing in the community' and, in Dr. Miller's view, represents no risk for future inappropriate behavior of this sort and further that Respondent had `an ability to curb impulses and maintain a professional demeanor.' The Hearing Panel has no way of knowing what the Respondent shared with Dr. Miller about his `lapses in judgment' because Dr. Miller's letter does not indicate.
"There can be no doubt that the Respondent has suffered significant consequences as a result of his actions, including the loss of the part-time prosecutor position he held with Prairie Village, as well as the pro tem appointments he apparently often received in Johnson County. Similarly, there is no question that this experience has been very stressful for the Respondent, adversely affecting both his finances and his marriage.
"That notwithstanding and recognizing that the affected AAs do not want to see the Respondent disciplined, I cannot escape the thought that the Respondent's conduct was both intentional and knowing. Nor can I imagine what might have convinced the Respondent that it was acceptable for him to expose himself to one AA, to rub his genitals in front of another, and send a third a digital photograph of his penis. Also of concern is the fact that the Respondent grabbed one AA by the arm and said, `Come on, just give me two minutes.' This AA had to forcibly remove her arm from the Respondent's grasp.
"Despite these facts, the Respondent testified that he did not realize, until after the complaint was initiated against him, that any of this behavior crossed the line.
"For all of these reasons, I respectfully dissent from the Recommendation made in this case by a majority of the Hearing Panel. I recommend that the Kansas Supreme Court adopt the recommendation made by the Disciplinary Administrator that Respondent be suspended from the practice of law for a period of six months and that Respondent be required to undergo a hearing pursuant to Kan. Sup.Ct. R. 219, prior to reinstatement. In this way, there will be some assurance that the issues with which Respondent has struggled have been appropriately addressed."
The Respondent raises three exceptions before this court to the panel's factual findings, conclusions of law, and recommended discipline. The Respondent does not take exceptions to the panel's conclusions that he repeatedly violated KRPC 8.4(d) (2009 Kan. Ct. R. Annot. 602) (engaging in conduct prejudicial to the administration of justice) and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

DISCUSSION
In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. In re Lober, 288 Kan. 498, 505, 204 P.3d 610 (2009); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321). Clear and convincing evidence is "evidence that causes the factfinder to believe that `the truth of the facts asserted is highly probable.'" In re Lober, 288 Kan. at 505, 204 P.3d 610 (quoting In re Dennis, 286 Kan. 708, 725, 188 P.3d 1 [2008]).
The Respondent filed three exceptions to the panel's final hearing report. Respondent took exception: (1) with the hearing panel's determination that he did not satisfy the provisions of Kansas Supreme Court Rule 211(g) in preparing a proposed probation plan; (2) to the minority opinion and its reported reliance on other unreported similar conduct as a factor in its recommendation; and (3) to the final hearing report's finding of illegal conduct as an aggravating factor. Respondent did not take exception to the hearing panel's recommended discipline of probation for 2 years. Respondent admitted to violating KRPC 8.4(d) and 8.4(g); thus, these violations are deemed admitted.

*35 Respondent's Probation Plan

Respondent admitted he provided the probation plan 2 days later than required by Rule 211(g). Nevertheless, the Disciplinary Administrator had no objection to our considering the respondent's proposed plan. We find that there are significant differences of detail between the plan submitted by Respondent and that recommended by the hearing panel. Respondent's plan failed to include any method to ensure compliance such as an audit reviewed by the Disciplinary Administrator or notice to the Disciplinary Administrator when psychological treatment ceased. In fact, this court would add one further requirement to Respondent's probation plan: that medical evidence that the problems precipitating Respondent's misconduct have been addressed on a continuing basis and will be addressed in the future be provided to the court. We are concerned that Dr. Cappo placed Respondent in the top 2% of those diagnosed with major depression yet no medication commonly used to treat depression has been utilized nor more intense treatment administered beyond meeting with a psychologist approximately once per month.

Minority Opinion's Reliance on Unreported Similar Conduct
Respondent's argument that the minority opinion inappropriately based its recommendation on similar unreported conduct is directly undercut by the opinion itself. The minority opinion states: "Though it is not a significant factor in my recommendation, I have some concern that there may have been other incidents of similar conduct that were not reported." Based on our review of the minority opinion's findings and recommendations, it is clear that the recommendation is based on Respondent's admitted misconduct and not alleged incidents of similar misconduct.

Finding of Illegal Conduct
The Respondent takes exception to the hearing panel's finding that Respondent engaged in illegal conduct. Respondent supports his argument by pointing out that Respondent's counsel twice informed the hearing panel that Respondent's conduct was investigated for possible criminal charges, but the Johnson County District Attorney's office declined to file a criminal case. The hearing panel found that Respondent engaged in criminal conduct when he exposed himself to AA#3 and stated, "I think I have something you would like." Further, the panel found Respondent may have engaged in illegal conduct when he sent a digital photograph of his penis to AA#4 via a mobile telephone text message.
In making its finding, the hearing panel considered the aggravating factors outlined by the ABA Standards. ABA Standard 9.22(k) states that one of the factors which may be considered an aggravating factor is "illegal conduct, including that involving the use of controlled substances." These standards do not require that a respondent be charged or convicted by law enforcement before conduct may be considered illegal. Further, the fact that an individual is not charged or convicted does not mean that the individual's acts did not violate a criminal statute. In In re Farrell, 271 Kan. 291, 21 P.3d 552 (2001), this court adopted the hearing panel's finding that the respondent in that case had engaged in illegal conduct by forging the names of others on negotiable instruments even though the respondent had not been convicted of forgery.
K.S.A. 21-3508(a)(2) provides: "Lewd and lascivious behavior is: .... publicly exposing a sex organ or exposing a sex organ in the presence of a person who is not the spouse of the offender and who has not consented thereto, with intent to arouse or gratify the sexual desires of the offender or another." Lewd and lascivious behavior under this set of facts is a misdemeanor. See K.S.A. 21-3508(b)(1). Respondent admitted that he exposed himself to AA #3. AA#3 was not his spouse nor did she, based on the record, provide consent for Respondent to expose himself to her. Based on the definition of lewd and lascivious behavior, Respondent engaged in this illegal conduct. Thus, we agree with the hearing panel's finding that Respondent engaged in illegal conduct under ABA Standard 9.22(k).
*36 Respondent's exceptions to the panel's findings do not affect or alter our determination of the appropriate discipline to be imposed. We have determined the appropriate discipline based on the admitted acts of misconduct alone and these are egregious in themselves, without considering: whether Respondent's probation plan satisfied the requirements of Rule 211(g), whether the minority inappropriately relied on unreported similar conduct, or whether some of his misconduct was punishable as a misdemeanor.
The panel's recommendation for discipline is advisory only, and it does not constrain this court from imposing a greater or lesser penalty. In re Dennis, 286 Kan. at 737, 188 P.3d 1; Rule 212(f) (2009 Kan. Ct. R. Annot. 337). We find ABA Standard 7.2 particularly helpful. It states: "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." ABA Standard 7.2.
Respondent intentionally and knowingly engaged in misconduct toward court personnel. On multiple occasions, he subjected five administrative assistants to sexual harassment. While Respondent admitted his actions in his answer to the complaint, throughout his testimony, he attempted to minimize the seriousness of his misconduct. Further, Respondent testified that it was not until after the complaint process was initiated that he realized his behavior constituted an ethical violation. In addition, given the particularly serious diagnosis by Dr. Cappo that Respondent is in the top 2% of those diagnosed with major depression, we are particularly concerned that Respondent should focus on treatment of this diagnosis so that the misconduct that occurred as a result does not repeat itself in the future. While we believe Respondent feels true remorse for his actions, this does not vitiate the seriousness of his misconduct.

CONCLUSION AND DISCIPLINE
IT IS THEREFORE ORDERED that Respondent, Chauncey M. Depew, be and he is hereby suspended from the practice of law for 1 year in accordance with Supreme Court Rule 203(a)(2) (2009 Kan. Ct. R. Annot. 272) for violations of KRPC 8.4(d) and (g) (2009 Kan. Ct. R. Annot. 602). We note that a minority of the court would find that Respondent's violations warrant a longer suspension period than we have ordered.
IT IS FURTHER ORDERED that Respondent will undergo a Rule 219 (2009 Kan. Ct. R. Annot. 376) hearing at the end of his suspension prior to being readmitted to practice law in Kansas. At the Rule 219 hearing, the panel should consider whether the Respondent has obtained adequate medical and psychological treatment for his depression, followed all treatment recommendations during the period of suspension, and has written letters of apology to AA#1, AA#2, AA#3, AA#4, AA#5, and the five respective division judges.
IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the Respondent and that this opinion be published in the official Kansas Reports.
JOHNSON, J., not participating.
PHILLIP M. FROMME, District Judge, assigned.[1]
NOTES
[1] REPORTER'S NOTE: District Judge Fromme was appointed to hear case No. 103,061 vice Justice Johnson pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.