**The PEOPLE of the State of Colorado, Complainant**

v.

**Gregory A. GOODMAN, Respondent.**

**No. 13PDJ075.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

June 2, 2014.

**OPINION AND DECISION IMPOSING
SANCTIONS PURSUANT TO
C.R.C.P. 251.19(b)**

### I. *SUMMARY*

On summary judgment, the People proved Respondent had fabricated documents that

he gave to the People in response to a disciplinary investigation and that he produced to opposing counsel in a related civil suit. He then made false statements regarding those documents during the disciplinary investigation and in testimony during the civil trial. The PDJ concluded that Respondent had violated Colo. RPC 3.3(a)(3) (offering false evidence), 8.1(a) (making a false statement of material fact in a disciplinary matter), and 8.4(c) (engaging in dishonest conduct). The Hearing Board now finds that Respondent's misconduct warrants disbarment.

## II. *PROCEDURAL HISTORY*

The People filed a complaint on September 23, 2013. Respondent answered the complaint on October 24, 2013. An at-issue conference was held on November 6, 2013, and a two-day hearing was set for April 8–9, 2014.

On February 11, 2014, the People filed a "Motion for Summary Judgment and Brief in Support Thereof," seeking entry of judgment on all three claims in their complaint, which allege violations of Colo. RPC 3.3(a)(3), 8.1(a), and 8.4(c). Respondent did not file a response, although the People indicated in their motion that Respondent had expressed opposition to their requested relief. The PDJ granted the People's motion on March 24, 2014, and converted the two-day disciplinary hearing to a one-day sanctions hearing.

During the sanctions hearing on April 8, 2014, the Hearing Board heard testimony from John Lonnquist. The Hearing Board also considered the People's argument concerning sanctions.

## III. *FACTS AND RULE VIOLATIONS*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 25, 2004, under attorney registration number 35992.[1] He is thus subject to the jurisdiction of the Court in these disciplinary proceedings.[2]

### Facts Established in the Complaint

Respondent represented Kim Gaetano and her medical marijuana business, 420 Wellness Dispensary, LLC ("420 Wellness"), in a purchase-sale transaction involving Thomas S. Waldron, Sr.[3] Respondent drafted the purchase-sale agreement on behalf of Gaetano and 420 Wellness.[4]

On October 1, 2010, Respondent sent an email along with a draft of the purchase-sale agreement to Waldron.[5] The email stated:

Attached is a *draft* purchase and sale agreement for your review. As we discussed, neither Kim nor Rich has signed off on this yet, so while I anticipate they would only have very minor changes to business points (if any), do keep that in mind. I'm also attaching the current form of 420's operating agreement. If these additional large investors came on board, this operating agreement is not going to be sufficient, I'm aware of that, we can address that as needed, but for the time being it's sufficient.[6]

Waldron emailed Respondent on December 10, 2010, asking whether he would be willing to continue representing 420 Wellness if its ownership changed hands.[7] On December 11, 2010, Gaetano and Waldron signed a revised purchase and sale agreement transferring to Waldron a fifty percent interest in 420 Wellness.[8] On January 21, 2011, Respondent told Waldron that Gaetano was contemplating severing relations with Waldron's company, AgraTek, and Waldron responded two days later, asking Respondent to encourage Gaetano to identify her concerns.

On March 24, 2011, a lawsuit was filed against Respondent, Gaetano, and 420 Wellness by Green–VisionTek, LLC, which alleged that it owned the interests in 420 Wellness that previously had been purchased by

1. Compl. ¶ 1; Answer ¶ 1.

2. *See* C.R.C.P. 251.1(b).

3. Compl. ¶ 2; Answer ¶ 2.

4. Compl. ¶ 3; Answer ¶ 3.

5. Compl. ¶ 5; Answer ¶ 5.

6. Compl. ¶ 5; Answer ¶ 5.

7. Compl. ¶ 24; Answer ¶ 24.

8. Compl. ¶ 27; Answer ¶ 27.

Waldron's company, AgraTek ("*Green–VisionTek* litigation").[9] Green–VisionTek was represented by John Lonnquist.[10]

Lonnquist filed with the People a request for investigation ("RFI") against Respondent on April 19, 2011, alleging that Respondent had misused his trust account funds by paying himself attorney's fees in connection with the purchase-sale agreement between AgraTek and 420 Wellness.[11] The People sent Respondent a letter regarding Lonnquist's RFI on April 22, 2011, stating that the RFI implicated disciplinary rules involving competency, conflicts of interest, safekeeping of property, threatening prosecution, and dishonesty.[12]

Respondent responded to the People on May 14, 2011.[13] He attached to his response copies of five emails that he had ostensibly sent to Waldron on October 1, 2010, November 2, 2010, December 10, 2010, and January 12, 2011, as well as an attachment to his email of October 1, 2010.[14] The copy of the email dated October 1, 2010, read:

> Attached is a *draft* purchase and sale agreement for your review. As we discussed, neither Kim nor Rich has signed off on this yet, so while I anticipate they would only have very minor changes to business points (if any), do keep that in mind. I'm also attaching the current form of 420's operating agreement. *Again, I'm fine communicating with you like this and you don't have to have your own attorney, but my job is to represent Kim, and while I can discuss and negotiate the contract with you and give you answers on any deal points, I am not your attorney.*[15]

Attached to the email was a draft purchase-sale agreement.[16] One of the emails dated December 10, 2010, that Respondent gave the People concerned Respondent's availability to discuss matters with Gaetano.[17] In the second email dated December 10, 2010, Respondent noted possible future conflicts of interest and noted that Gaetano, not Waldron, was his client.[18] In the email dated January 12, 2011, Respondent referred to an attached operating agreement for 420 Wellness.[19] The content of the emails dated December 10, 2010, and January 12, 2011, differed in material respects from the content of the versions of the same emails Waldron had supplied.[20]

On February 16, 2012, the People dismissed the RFI against Respondent, with the requirement that he attend trust account school.[21]

During the *Green–VisionTek* litigation, Respondent disclosed to Lonnquist the same versions of the emails that Respondent had produced to the People dated October 1, 2010, December 10, 2010, November 2, 2010, and January 12, 2011.[22] They contained the same discrepancies described above between the emails Respondent gave to Lonnquist and the copies of the same emails that Waldron gave to Lonnquist.[23] In his deposition during the *Green–VisionTek* litigation, Respondent testified that his own copies of the

9. Case number 2011CV22231, Denver District Court. People's Mot. for Summ. J. Ex. 3, attach. 1. ¶ 1; *see also* Compl. ¶ 49; Answer ¶ 49 (neither admitting nor denying the People's allegation regarding the filing of this lawsuit).

10. People's Mot. for Summ. J. Ex. 3 at 1.

11. People's Mot. for Summ. J. Ex. 1.

12. People's Mot. for Summ. J. Ex. 2.

13. People's Mot. for Summ. J. Ex. 3; Compl. ¶ 51; Answer ¶ 51.

14. Compl. ¶¶ 51–55; Answer ¶¶ 51–55.

15. People's Mot. for Summ. J. Ex. 3, attach. 6 (emphasis added); Compl. ¶ 51; Answer ¶ 51. *Compare with* Compl. ¶ 5; Answer ¶ 5.

16. People's Mot. for Summ. J. Ex. 3, attach. 6; Compl. ¶ 52; Answer ¶ 52.

17. Compl. ¶ 53; Answer ¶ 53.

18. Compl. ¶ 53; Answer ¶ 53.

19. Compl. ¶ 54; Answer ¶ 54.

20. Compl. ¶¶ 53–54; Answer ¶¶ 53–54.

21. Compl. ¶ 56; Answer ¶ 56.

22. Compl. ¶ 57; Answer ¶ 57.

23. Compl. ¶¶ 53–55, 57–59; Answer ¶¶ 53–55, 57–59; People's Mot. for Summ. J. Ex. 4 at 717:21–718:15; 719:1–20.

emails were accurate.[24]

A bench trial was held in the *Green–VisionTek* litigation on July 26–27, 2012, and August 16, 2012.[25] During the trial, Respondent testified that he had given the People documents in response to the RFI, including the email with the italicized language above dated October 1, 2010, and the purchase-sale agreement attached to that email.[26]

Also during the trial, a forensic expert named Robert Kelso testified.[27] Kelso had been given copies of documents, emails, and email attachments and had been asked to authenticate them, comparing them with electronic versions of the same.[28] Kelso acquired a forensic image of Waldron's computer and received an electronic copy of Waldron's America Online ("AOL") email account directly from AOL servers.[29] Kelso then prepared expert reports, which were admitted without objection.[30] In his reports, Kelso analyzed the versions Respondent had provided to the People and to Lonnquist of the email exchanges dated October 1, 2010 (and the attachment), November 2, 2010, December 10, 2010, and January 12, 2011.[31] Kelso concluded that Respondent had fabricated these emails and the attachment.[32] Respondent did not introduce any expert testimony at trial contravening Kelso's conclusions.[33]

The court in the *Green–VisionTek* litigation found that Respondent had altered the content of the email dated October 1, 2010, and the attached draft of the purchase-sale agreement.[34]

### Additional Findings Based on Testimony

At the sanctions hearing, Lonnquist testified that he had been retained by Waldron shortly after the 420 Wellness purchase-sale transaction was completed and after approximately $1.25 million dollars had been transferred to Gaetano through Respondent's trust account. According to Lonnquist, Gaetano then sought to rescind the contract, even though Respondent had transferred from his trust account almost $800,000.00 to fund a down payment on a warehouse and $15,000.00 to pay his own fees. On Waldron's behalf, Lonnquist filed a civil suit, *Green–VisionTek v. 420 Wellness Dispensary, LLC*, which also named Gaetano and Respondent as defendants. This suit alleged breach of contract, fraud, conversion, mishandling of a trust account, and conflict of interest.

Lonnquist testified that around the same time, in April 2011, he filed his RFI with the People in which he contended that Respondent had mishandled client funds and engaged in a conflict of interest. The People sought Respondent's answer to those allegations and Respondent, in turn, submitted a reply, along with voluminous documentation. When the People provided copies of these records to Lonnquist, he asked Waldron, his client, to review them. Lonnquist recalled Waldron contacting him a few days later to announce that he had "found a smoking gun." Waldron explained to Lonnquist that the documents Respondent had provided to the People differed materially from the documents Respondent had sent Waldron when the purchase-sale agreement was being negotiated.

24. Compl. ¶ 59; Answer ¶ 59.

25. Compl. ¶ 60; Answer ¶ 60.

26. People's Mot. for Summ. J. Ex. 5 at 386: 11–15; 387: 21–389: 6; 389: 24–390:7; People's Mot. for Summ. J. Ex. 5 at attach. 18.

27. Compl. ¶ 61; Answer ¶ 61.

28. People's Mot. for Summ. J. Ex. 4 at 707: 4–10.

29. People's Mot. for Summ. J. Ex. 4 at 707: 11–21.

30. People's Mot. for Summ. J. Ex. 4 at 708:1–20

31. People's Mot. for Summ. J. Ex. 4 at 709:16–21; 710: 13–20; 712:10–18; 713:19–714: 8; 720: 23–721:3; 721:4–726: 5; People's Mot. for Summ. J. Ex. 4 attach. 94 at 5–14; People's Mot. for Summ. J. Ex. 4 attach. 95 at 5–14.

32. *See* Compl. ¶ 62; Answer ¶ 62 (admitting Kelso testified at trial but denying his findings); People's Mot. for Summ. J. Ex. 4 attachs. 94 & 95. *See* People's Mot. for Summ. J. ¶¶ 36–55 for additional allegations regarding Kelso's expert trial testimony.

33. Compl. ¶ 63; Answer ¶ 63.

34. Compl. ¶ 65; Answer ¶ 65.

Lonnquist testified that he looked at several documents side-by-side and thought, "something is wrong here; this isn't the same stuff." Lonnquist then hired Kelso to perform his forensic evaluation. By mid-July 2011, Lonnquist recalled, Kelso's analysis had revealed that Respondent's documents were "phony."

Lonnquist knew that if he provided this analysis to the People, they would be required to give the information to Respondent. Lonnquist reasoned that he would need to depose Respondent in the civil suit and "tie him into" the documents before turning over Kelso's analysis to the People. Six months later, Lonnquist deposed Respondent, who stood by the accuracy of the documents he had given the People. Lonnquist then promptly sent Kelso's report to the People. But during the intervening time period, the People had already determined that Lonnquist's April 2011 grievance did not merit disciplinary action.

Meanwhile, Respondent's fabricated documents immeasurably complicated Lonnquist's efforts to prove Waldron's civil case. "As soon as we saw falsified documents in late May, we knew we weren't dealing with someone who is playing by the rules," Lonnquist related. He could not rely on the authenticity of any of the documents Respondent produced, nor could he trust any of Respondent's representations. As a result, he was forced to hire Kelso to closely examine each document that Respondent produced, creating additional expense for Waldron.[35] Lonnquist estimated that had he not been compelled to worry about "phony documents" he could have prepared the case in "half of the time" that it actually took him.

Further, said Lonnquist, the trial itself lasted twice as long as it should have: the issue of falsified documents required him to introduce and lay a foundation for two separate document sets, compare the two, and then engage in extended argument about the

implications. He also had to call Kelso as an expert witness to describe his forensic analysis. All told, Lonnquist litigated the matter for one-and-a-half years and tried the case for two-and-a-half days—an effort that cost $300,000.00 in attorney's fees.

## Rule Violations

In granting the People's motion for summary judgment, the PDJ determined that Respondent violated Colo. RPC 3.3(a)(3). That rule prohibits a lawyer from knowingly offering evidence that the lawyer knows is false. The PDJ concluded, based on the undisputed material facts, that Respondent violated Colo. RPC 3.3(a)(3) by providing false testimony before the trial court in the *Green–VisionTek* litigation.

Next, the PDJ granted summary judgment on the People's Colo. RPC 8.1(a) claim. Colo. RPC 8.1 prohibits a lawyer from knowingly making a false statement of fact in connection with a disciplinary matter. As the undisputed evidence demonstrated, Respondent violated this rule by knowingly giving the People fabricated copies of various documents and by knowingly making false statements regarding these documents in the disciplinary investigation.

Last, the PDJ determined that the undisputed material facts established that Respondent contravened Colo. RPC 8.4(c), which states "it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The PDJ concluded these facts showed that Respondent acted dishonestly by falsifying the documents he provided to the People and to Lonnquist. Summary judgment was also entered on this claim because Respondent had testified in the *Green–VisionTek* litigation as to the validity of the documents he had fabricated.

---

**35.** Lonnquist noted that he also hired attorney Craig Truman to provide a certificate of review declaring that the claim against Respondent did not lack substantial justification. Although Lonnquist testified that Truman was not initially hired to address the falsified documents, his role "morphed into that." Nevertheless, he could not recall whether Truman offered testimony in the civil trial about the falsified documents. According to Lonnquist, Waldron spent somewhere between $2,000 and $10,000.00 in total for Kelso's and Truman's expert services, although Lonnquist could not remember what percentage of that total either expert was paid.

## IV. SANCTIONS

The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the determination of sanctions for lawyer misconduct.[36] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated his duty to the legal system and to the public. A lawyer who does not operate within the bounds of the law violates his duty to the legal system. Lawyers are officers of the court, and the public expects lawyers to abide by substantive and procedural rules governing the administration of justice; it is axiomatic that they must not create or use false evidence or make false statements of material fact.[37] Respondent also flouted his duty to the public to maintain personal integrity when he engaged in dishonest conduct.

*Mental State:* The PDJ's order granting summary judgment concluded that the People had proved every element of their Colo. RPC 3.3(a) and 8.1(a) claims, both which expressly require proof of a knowing mental state. In that order, the PDJ concluded the undisputed facts showed that Respondent presented fabricated documents to the People and Lonnquist, and that he made false statements regarding those documents to the People and in the *Green–VisionTek* litigation. "[I]t would be illogical ... to infer that Respondent acted with anything less than a knowing state of mind," held the PDJ, since "[o]ne does not negligently fabricate documents and make false statements regarding such documents under the type of circumstances presented here."[38]

The PDJ's order, however, does not preclude the Hearing Board from finding that Respondent acted not only knowingly but intentionally, and we do so here. Whereas knowledge is the conscious awareness of the nature of the conduct but without the conscious objective or purpose to accomplish a particular result, intent is defined as the conscious objective or purpose to accomplish a particular result.[39] Respondent's dishonesty was intentional because it was done with the conscious objective to absolve himself of disciplinary rule violations and civil liability. Respondent changed certain documents, and those changes neutralized allegations in the RFI that he had engaged in conflicts of interest and had committed trust-account violations. We find this establishes that Respondent doctored those documents in order to throw the disciplinary inquiry off track and evade the consequences of his alleged misconduct.

*Injury:* Respondent's deception harmed Waldron, Lonnquist, Gaetano, the district court, the profession's system of self regulation, and the public. As Lonnquist testified, Respondent's introduction of falsified documents into the civil litigation forced Waldron to expend substantial sums of money to verify the authenticity of each document that Respondent produced. For the same reasons, Lonnquist confronted more complex discovery issues and was required to invest significantly more time in preparing the case. By presenting fraudulent documents, Respondent wasted the time and resources of all involved, including Waldron, Lonnquist, Gaetano, and the district court judge, who presided over a lengthier trial and made specific findings concerning Respondent's dishonesty.

36. *See In re Roose,* 69 P.3d 43, 46–47 (Colo. 2003).

37. ABA *Standard* 6.0. *See In re Cleaver–Bascombe,* 986 A.2d 1191, 1200 (D.C.2010) ("Lawyers have a greater duty than ordinary citizens to be scrupulously honest *at all times,* for honesty is "basic" to the practice of law.... Every lawyer has a duty to foster respect for the law, and *any* act by a lawyer which shows disrespect for the law tarnishes the entire profession.") (citations omitted).

38. Ord. Granting Summ. J. at 7.

39. ABA *Standards* § IV, Definitions.

Respondent's misconduct shook Lonnquist's trust in fellow members of the bar and subverted his expectation that attorneys behave honestly and abide by the law. Said Lonnquist, "We're officers of the court. If you can't trust the guy on the other side of the table, you've got a real problem...."[40] Respondent likewise substantially undermined public confidence in the Colorado Supreme Court's attorney regulation process and the state's system of justice. The public must be able to rely upon the integrity of lawyers. As Lonnquist opined, it is impossible to sustain an effective system of justice if lawyers fabricate evidence. So, too, is it impossible to sustain an effective system of attorney self-regulation if lawyers are dishonest with the regulatory authorities. As the People argued in closing, Respondent's misrepresentations and fabrications corrupted the functioning of the attorney regulation system; if Respondent had made available to the People true and accurate documentation, they could have addressed the underlying conflict of interest and trust account issues so as to adequately protect the public, including Respondent's clients. Because Respondent was untruthful, they were not able to do so.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Disbarment is the presumptive sanction for Respondent's misconduct in this case, as set forth in several ABA *Standards*. Respondent's violations of Colo. RPC 8.4(c) (dishonesty, fraud, deceit, or misrepresentation) and Colo. RPC 8.1(a) (knowingly making a false statement of fact in a disciplinary matter) implicate ABA *Standard* 5.11(b). That standard calls for disbarment when a lawyer engages in intentional conduct that involves dishonesty, fraud, deceit, or misrepresentation and that seriously adversely reflects on the lawyer's fitness to practice.

Likewise, ABA *Standard* 6.11 provides that disbarment is typically warranted when a lawyer, with the intent to deceive a court, makes a false statement, submits a false document, or improperly withholds material information, thereby causing serious or potentially serious injury to a party or causing a significant or potentially significant adverse effect on the legal proceeding. ABA *Standard* 6.11 governs Respondent's violation of Colo. RPC 3.3(a)(1) (false statements to a tribunal).

Disbarment is also the presumptive sanction under ABA *Standard* 7.1 when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer, resulting in serious or potentially serious injury to the client, the public, or the legal system. That standard applies to Respondent's violation of Colo. RPC 8.1(a).

We also take into account that in cases involving multiple types of attorney misconduct, the ABA *Standards* recommend the ultimate sanction should be at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation.[41]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating factors are considerations or circumstances that may justify an increase in the presumptive discipline to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[42] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Dishonest or Selfish Motive—9.22(b):* Respondent presented fabricated documents to the People in response to a disciplinary investigation. Those documents were modified to counter Lonnquist's allegations of misconduct and designed to avert imposition of any sanction for that misconduct. We apply this factor in aggravation.

---

**40.** *Accord In re Reback,* 513 A.2d 226, 231 (D.C. 1986) ("Honesty is basic to the practice of law.... A lawyer's word to a colleague at the bar must be the lawyer's bond. A lawyer's representation to the court must be as reliable as a statement under oath.").

**41.** ABA *Standards* § II at 7.

**42.** *See* ABA *Standards* 9.21 & 9.31.

*Pattern of Misconduct—9.22(c):* Respondent falsified more than one document for submission to the People and then repeatedly vouched for the authenticity of those documents. Respondent's misconduct spanned an extended period encompassing the filing of Lonnquist's RFI, the People's initial investigation of the RFI, Respondent's deposition in the GreenVision–Tek litigation, and his testimony during that trial. The Hearing Board considers this ongoing pattern of dishonesty to be a significant aggravating factor.

*Multiple Offenses—9.22(d):* Respondent's failure to abide by the ethical standards governing attorneys was not the result of a single transaction, and his misconduct does not involve a single instance of dishonesty. Instead, he engaged in misconduct on multiple occasions, targeting different audiences. We therefore apply this factor in aggravation.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* Respondent has continually failed to acknowledge the wrongful nature of his conduct. Although he concedes in his answer that there are discrepancies between the documents on Waldron's computer and those he produced to the People, throughout the course of this proceeding he neither offered any possible explanation for those discrepancies nor took responsibility for falsifying documents. We give this aggravating factor significant weight.

■ *Substantial Experience in the Practice of Law—9.22(i):* The People urge us to apply this factor in aggravation. Respondent was admitted to the Colorado bar in October 2004, so at the time of his misconduct Respondent had been practicing law for seven to eight years. Case law suggests that ten years in the practice of law generally qualifies as substantial experience.[43] In contrast, the Colorado Supreme Court has affirmed a hearing board's finding that a lawyer's misconduct, which occurred when she had been practicing for six to eight years, merited mitigation for her inexperience under ABA Standard 9.32(f).[44] In this case, we choose to apply neither an aggravating factor of substantial experience nor a mitigating factor of inexperience. Even if we were to find that Respondent lacked experience, that fact would carry no weight in mitigation here; Respondent needed no experience to understand that intentionally presenting false documents to the People and to the trial court was inherently dishonest.[45]

■ *Bad Faith Obstruction of the Disciplinary Proceeding By Intentionally Failing to Comply With Rules of Orders of the Disciplinary Agency—9.22(e):* At the sanctions hearing, the People advanced for the first time application of this factor based on Respondent's failure to participate after filing his answer. But the People could not point to a rule or order that would mandate Respondent's participation in the disciplinary proceeding, and they were not able to cite any authority that suggests failure to participate qualifies as bad faith obstruction. We decline to consider this factor in aggravation.

■ *Illegal Conduct, Including That Involving the Use of Controlled Substances—9.22(k):* The People advocated for application of this factor at the sanctions hearing and tendered in support thereof C.R.S. section 18–8–502(1), which defines perjury in the first degree. That statutory subsection provides, "A person commits perjury in the first degree if in any official proceeding he knowingly makes a materially false statement, which he does not believe to be true, under an oath required or authorized by law."[46] We find by clear and convincing evidence that Respondent's false testimony before the trial court fits this definition, and we apply this factor in aggravation.[47]

43. *People v. Rolfe,* 962 P.2d 981, 983 (Colo.1998).

44. *People v. Hensley–Martin,* 795 P.2d 262, 265 (Colo.1990).

45. *See In re Cleland,* 2 P.3d 700, 705 (Colo.2000) ("inexperience does not go far in our view to excuse or to mitigate dishonesty, misrepresentation, or misappropriation. Little experience in the practice of law is necessary to appreciate such actual wrongdoing.").

46. C.R.S. § 18–8–502(1).

47. Respondent need not have been convicted of a crime for this standard to apply. Rather, the Hearing Board looks only to whether the facts establish by clear and convincing evidence that

*Absence of a Prior Disciplinary Record—9.32(a):* Respondent has not been sanctioned for misconduct before. We consider this a factor in mitigation.

## Analysis Under ABA *Standards* and Case Law

■ The Hearing Board is mindful of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[48] since "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[49] Though prior cases are helpful by way of analogy, the Hearing Board is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

■ We begin our analysis with the presumptive sanction, which without question is disbarment. The Colorado Supreme Court has emphasized that lawyers represent the legal system, stating: "Lawyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the system, too, must be dishonest. Certainly, the reality of such behavior must be abjured so that the perception of it may diminish."[50] Respondent's dishonesty to the court and to the People is particularly troubling in this case, where his misrepresentations were both intentional and repeated, and where he continued to perpetuate falsehoods in an attempt to avoid civil and disciplinary sanctions. When this misconduct is considered in conjunction with the five applicable aggravating

factors—weighed against the lone mitigating factor—it is all the more clear that disbarment is necessary.

The People direct the Hearing Board to *People v. Kolbjornsen,* a case involving a lawyer who had been charged with speeding and failing to provide proof of insurance.[51] At his trial for these offenses, the lawyer introduced into evidence a falsified insurance card, which misrepresented that he had insurance on the date of the speeding stop; in addition, the lawyer testified that he had insurance on the date in question.[52] "Testifying falsely under oath to a tribunal is an extremely serious ethical violation, and raises substantial questions about a lawyer's fitness to practice law," the Colorado Supreme Court observed.[53] Even though it questioned whether, given the facts of that case, any period of suspension would be adequate, the Colorado Supreme Court ultimately imposed a suspension of just one year and one day.[54] Although the People cite *Kolbjornsen* to underscore the Colorado Supreme Court's disdain for dishonest conduct, they distinguish the misconduct in *Kolbjornsen* from the facts present here, which they characterize as a protracted pattern of deceitful behavior more egregious than that in *Kolbjornsen.*

The Hearing Board agrees that the dictum in *Kolbjornsen* is instructive but that the sanction imposed there is not appropriate for Respondent's misconduct here. We look instead to *In re Whitt,* a Washington State disciplinary case.[55] In that case, Whitt was charged with failing to act diligently on her client's behalf, failing to adequately commu-

Respondent committed a crime. *See People v. Musick,* 960 P.2d 89, 92 (Colo.1998) (deeming the actual nature of the respondent's behavior more significant than the presence or absence of a criminal charge); *see also In re Depew,* 290 Kan. 1057, 237 P.3d 24, 35 (2010) (approving of the application of ABA *Standard* 9.22(k), even though the respondent was not charged or convicted of conduct considered illegal); *In re Kamb,* 177 Wash.2d 851, 305 P.3d 1091, 1099 (2013) ("[A]n attorney may be sanctioned for committing a crime for which he was never charged.").

**48.** *See In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *In re Fischer,* 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and underval-

ued the importance of mitigating factors in determining the needs of the public).

**49.** *In re Attorney F.,* 285 P.3d at 327 (quoting *People v. Rosen,* 198 P.3d 116, 121 (Colo.2008)).

**50.** *In re Pautler,* 47 P.3d 1175, 1179 (Colo.2002).

**51.** 917 P.2d 277, 278 (Colo.1996).

**52.** *Id.* at 278–79.

**53.** *Id.* at 279.

**54.** *Id.*

**55.** 149 Wash.2d 707, 72 P.3d 173, 175 (2003).

nicate, failing to abide by her client's directives, and failing to be honest about the status of her client's case.[56] But the most serious count alleged that Whitt had made false representations and had submitted fabricated documents during the disciplinary process.[57] A hearing officer recommended disbarment, but on review a disciplinary board imposed a two-year suspension, psychological evaluation, and a two-year probationary period with monitoring.[58] The Washington Supreme Court rejected the board's recommendation and disbarred Whitt, reasoning that "[f]alsifying information during an attorney discipline proceeding is one of the most egregious charges that can be leveled against an attorney." [59] Although Whitt had no prior discipline, the Washington Supreme Court concluded that Whitt's false representations and fabricated documents weighed far too heavily to justify a downward departure from the presumptive sanction of disbarment.[60]

As *Whitt* made clear, Respondent's misrepresentations and fabrications reflect adversely on his fitness to practice law, the public perception of the legal system, and the judicial process as a whole.[61] Indeed, submission of fabricated documents—whether in a civil suit or a disciplinary proceeding—should be "unthinkable" for a lawyer.[62] Respondent's several acts of dishonesty demonstrate that he is capable of harming the public and the justice system so long as he maintains his law license. Considering this risk, along with the dishonorable nature of Respondent's misconduct, the presumptive sanction recommended by three applicable ABA *Standards,* and the five factors in aggravation, we conclude Respondent's misconduct demands that he be disbarred.

56. *Id.* at 176.

57. *Id.*

58. *Id.* at 176–77.

59. *Id.* at 175,180.

60. *Id.* at 181.

61. *Id.* at 180.

62. *In re Marshall,* 762 A.2d 530, 536 (D.C.2000); see also *In re Cleaver-Bascombe,* 986 A.2d at 1200 ("lying under oath on the part of an attor-

## V.  CONCLUSION

Respondent presented fabricated documents and false statements to the People during a disciplinary investigation, which prevented the disciplinary system from functioning as the Colorado Supreme Court intended that it should. He produced those same documents in the *Green–VisionTek* litigation and testified to their authenticity at trial. Because his falsifications and misrepresentations reflect such a complete deviation from the appropriate ethical standards for members of the legal profession, the Hearing Board concludes that Respondent must be disbarred.

## VI.  ORDER

The Hearing Board therefore **ORDERS**:

1. **GREGORY A. GOODMAN,** attorney registration number **35992,** is **DISBARRED.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [63]

2. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the PDJ, within fourteen days of issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d).

4. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Monday, June 23, 2014.** No extensions of time will be granted. Any response thereto

ney for the purpose of attempting to cover-up previous misconduct is absolutely intolerable" and "warrants not only disbarment but also disgrace, shame, and obloquy") (citations and quotations omitted).

63. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

**SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs," **within fourteen days of the date of this order.** Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.